IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-0096-ZLW-(MJW)

DEBBIE ALCORTA,

Plaintiff,

v.

ROARING FORK SCHOOL DISTRICT,

Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant Roaring Fork School District (the "District"), through its attorneys SEMPLE, MILLER, MOONEY, & FARRINGTON, P.C., by Patrick B. Mooney and Matt Ratterman, hereby submits the following motion for summary judgment. In support thereof, Defendant states as follows:

**I. INTRODUCTION**

On December 7, 2004, Plaintiff Debbie Alcorta ("Alcorta") filed a Complaint against the District. Alcorta amended the Complaint on March 30, 2005. In her Amended Complaint, Alcorta asserts two claims for relief: 1) the District violated Title VII and Title IX by subjecting her to a hostile work environment, subjecting her to dissimilar and discriminatory working conditions and terms, refusing to promote her, terminating her and refusing to renew her employment, all because of her gender; and 2) the District violated Title VII and Title IX by retaliating against her for her complaints about discriminatory conduct by the District and

because of her complaints about inequitable and disparate treatment of female athletes of the District. The District seeks summary judgment on both of Plaintiff's claims.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

For the purposes of this motion, the following material facts are undisputed:

*A.    1999-2000 and 2000-01 School Years*

Alcorta was hired to coach the girls' junior varsity basketball team at Basalt High School ("Basalt") for the 1999-2000 school year. (Alcorta Deposition Transcript, p.12, l.23.) The principal of Basalt at the time was Mike Costanzo and the athletic director was Paul Cain. *Id.* at p.17, ll.4-8. Alcorta coached the junior varsity the next season as well, during the 2000-01 school year. *Id.* at p.12, l.20.

*B.    2001-02 School Year*

In the spring of 2001, the head coach position of the Basalt girls' varsity basketball team became vacant due to the resignation of the head coach. *Id.* at p.18, ll.18-25. Alcorta applied and interviewed for the open position, and was offered the job to coach the varsity team for the 2001-02 school year by Basalt principal James Waddick ("Waddick"). *Id.* at p.19, l.3 – p.21, l.16. Following the season, Basalt Athletic Director Mike Green ("Green") completed a performance evaluation for Alcorta on May 14, 2002, in which the following categories were indicated as needing improvement by Alcorta: 1) her relationship with opponents and 2) following purchasing procedures. *Id.* at p.128, ll.12-17; Exhibit 4.

*C.    2002-03 School Year*

Alcorta received and accepted an offer to coach again during the 2002-03 school year. (Alcorta Deposition Transcript, p.12, ll.3-9.) Green authorized $3,200 in expenditures for

2

uniforms in 2002-03. (Alcorta Deposition Transcript, p. 31, ll.3-23.) Alcorta spent over $6,000, buying warm-up suits first, and then uniforms. *Id.*, p.36, ll.7-10. Before ordering the uniforms, Alcorta had not informed anyone at Basalt that she intended to pay for them out of her own pocket. *Id.*, p.40, ll.7-10.

On September 25, 2002, Alcorta ordered $3,146.00 worth of basketball uniforms from Denver Athletic Supply. *Id.*, p.35, ll.3-10. On the purchase order form Alcorta used for the purchase, she signed Green's name on the "Authorized By" line. *Id.*; p. 35, ll.17-19; Affidavit of James Waddick, ¶15-17, Exhibit 1. Alcorta did not inform Basalt of her use of such order form, or that she signed Green's name on the order form. (Alcorta Deposition Transcript, p.34, l.23.) In early 2003, Basalt began to receive notices that the order was not paid. (Waddick Affidavit, ¶15.) Shortly thereafter, Denver Athletic Supply sent a copy of the purchase order to Waddick for review. *Id.*, ¶17.

Early in the 2002-03 basketball season, Waddick received a report that Alcorta had attended a basketball game at Roaring Fork High School, and had gotten angry because she was not allowed to attend the game for free. Waddick was advised that Alcorta then borrowed money from another person to pay for her admission. *Id.*, ¶10. Waddick discussed the Roaring Fork incident with Alcorta and expressed concern about how such a public outburst of anger was not appropriate for a representative of Basalt. *Id.*, ¶11. In response to Waddick's comments,. Alcorta denied attending the game at Roaring Fork. *Id.*, ¶12. Waddick called the Roaring Fork athletic director to confirm whether there had been a mistake in identifying Alcorta at the game. The athletic director told Waddick he saw her personally, and he knew which person Alcorta borrowed money from. *Id.*, ¶13. The athletic director also informed me that the school secretary

3

was taking tickets at the game, and the secretary recognized Ms. Alcorta and witnessed Ms. Alcorta's angry outburst. *Id.*, ¶14.

During the 2002-03 school year, Waddick heard comments from Basalt students, parents of Basalt students, representative of other schools and basketball officials about the conduct of Ms. Alcorta and her team. The comments addressed bullying of some team members by "star" players, unsportsmanlike conduct by the team, Ms. Alcorta's coaching method of standing up, moving up and down the sideline and shouting during games, and inappropriate dress by team members after games. (Waddick Affidavit, ¶21.)

    *i.*    *February meeting*

On February 7, 2003, Green and principal Waddick met with Alcorta to discuss her unauthorized purchase of the uniforms, as well as other problems with Alcorta's conduct and issues related to the Basalt girls' basketball team. *Id.*, ¶22. In addition to the Denver Athletic Supply order forgery, Green and Waddick expressed concern to Alcorta over reports they had received and their own observations, that: 1) certain "star" players were bullying and intimidating their teammates; 2) Alcorta had violated the procedure for picking all-conference players; 3) Alcorta had boasted to school-age participants in her basketball camp that she could "pick up any man" she wanted; 4) Alcorta's angry reaction to not being admitted for free to the basketball game at Roaring Fork High School, and its poor reflection on Basalt; 5) reports from officials that Alcorta's players conducted themselves in an unsportsmanlike manner and the perception that Alcorta condones such conduct; 6) Alcorta's animated coaching style, which included standing and shouting during games, violated Colorado High School Activity Association ("CHSAA") rules and was excessively demonstrative, resulting in complaints from

4

opponents, officials and parents; 7) Alcorta's team dressed inappropriately following games; 8) public impressions of Alcorta's team reflected poorly on Basalt; and 9) certain basketball players had reported to Green, Waddick and Basalt school counselors their concerns about the way they were treated by Ms. Alcorta, her use of negative motivation, the lack of a team environment, and the divisive impacts of Ms. Alcorta's coaching methods. *Id.*

In response to questions about the Denver Athletic Supply forgery, Alcorta did not deny she had created and signed the form. *Id.*, ¶23. Alcorta admits she wrote Green's name on the form, but claims she did not understand the "authorized by" line called for Green's signature and that she was merely noting Green's approval of the purchase. (Alcorta Deposition Transcript, p.36, ll.2-4.) Nevertheless, it is not disputed that Green and Waddick believed Alcorta forged Green's signature. (Michael Green Deposition Transcript, p.107, ll.21-24.) Alcorta herself understood that Waddick and Green considered Green's signature to have been forged. (Alcorta Deposition Transcript, p.38, ll.10-12.)

At the meeting, Waddick and Green placed the following conditions on Alcorta's continued employment: 1) clean up the financial mess with Denver Athletic Supply; 2) remain seated during basketball games unless otherwise permitted by CHSAA rules; 3) no new incidents of misconduct ny Alcorta; and 4) no discussion of the meeting or its outcome with parents or players. (Waddick Affidavit, ¶24.)

Alcorta reported to Green that she sent certain payments to Denver Athletic Supply. (Green Deposition Transcript, p.95, l.19 – p.97, l.16; Waddick Affidavit, ¶20.) Through numerous phone calls to Denver Athletic Supply, Waddick learned that no such payments had

5

been made by Alcorta.  (Green Deposition Transcript, p.96, l.11 – p.97, l.20; Waddick Affidavit, ¶20.)

  *ii.*  *June meeting*

Following the season, on June 13, 2003, Green and Waddick met with Alcorta again to deliver Alcorta's 2002-03 performance evaluation.  *Id.*, ¶28.  They noted that some of the issues from the February meeting had been improved, but that others affecting the reputation of Alcorta's program remained.  *Id.*, ¶29.  Specifically, Green and Waddick addressed what they perceived were problems with:  1) the reputation of Alcorta's program, including Alcorta's "win at all costs" philosophy, in which she embarrassed opponents by keeping Basalt's best players in games to "run up the score" when Basalt was ahead by a large margin against overmatched opponents; 2) Alcorta's honesty and integrity, in light of Alcorta's forgery of Green's name on the Denver Athletic Supply order, her misrepresentations about making payments for the order, and her denial of attending the Roaring Fork basketball game despite reports from multiple witnesses who saw Alcorta at the game complaining loudly, and 3) treatment of her players, including recognition that she was a role model for the students and that there were concerns of the behavior Ms. Alcorta was allowing her students to engage in.  *Id.*  Waddick advised Alcorta of his intention to offer the coaching job to her for the 2003-04 season, but again noted no new incidents concerning her misconduct would be tolerated.  *Id.*, ¶30; Alcorta Deposition Transcript, p.138, ll.19-21.

  *iii.*  *DUI and nonrenewal*

The following month, in July 2003, while driving with a fourteen-year-old female passenger in the car, Alcorta was arrested on suspicion of DUI.  (Alcorta Deposition Transcript,

p.161, l.18 – p.163, l.18.) Her arrest was reported on the front page of the Aspen Daily News on July 22, 2003. (Waddick Affidavit, ¶31.) A few days later, Alcorta appeared at a meeting of her team parents and admitted her guilt for the DUI charge and that she was driving with a fourteen-year-old female passenger in her car. (Alcorta Deposition Transcript, p. 169, l.14 – p.170, l.1; p. 173, ll.8-16.) Following the Aspen Daily News story, a photo of Ms. Alcorta titled "COACH OF THE YEAR" was taped to the front door at the high school. The photo had handwritten comments on it referring to Ms. Alcorta's DUI arrest, including: "But should she Be?" (presumably in reference to the Coach of the Year title) and "IS THERE BOOZE IN THERE" (in reference to a drinking cup held by Ms. Alcorta in the photo). (Waddick Affidavit, ¶32.) On August 8, 2003, Waddick notified Alcorta that she would not be offered a coaching position for the 2003-04 school year. *Id.*, ¶34.

### III.  ARGUMENT

This motion is brought pursuant to Federal Rule of Civil Procedure 56(c). Under such Rule, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment "has proven its usefulness as a means to avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Electric Co.*, 950 F.2d 812, 822 (1st Cir. 1991). The trial court must grant summary judgment "unless there is sufficient evidence

favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

The District is submitting affidavits, together with exhibits and portions of Alcorta's and Green's deposition testimonies, which demonstrate the absence of genuine issues for trial. *Mares v. ConAgra Poultry*, 971 F.2d 492, 494 (10th Cir. 1992). Alcorta, as the non-moving party, bears the burden of showing that there are disputed issues of material fact yet to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). She may not merely "rest upon [her] laurels (or [her] pleadings)." *Mack v. Great Atlantic Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). While the court must view the case in a light most favorable to the Alcorta, she must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Alcorta claims violations of Title VII and Title IX of the Civil Rights Act of 1964 as the bases for this action. She further claims that she was damaged due to retaliation by the District for her opposition to the discrimination taking place in Basalt.

**A.     The District is entitled to summary judgment on Plaintiff's claim that they violated Title VII and Title IX by subjecting her to a hostile work environment.**

Alcorta asserts Title IX as the basis for a hostile work environment claim, although no such cause of action exists. The authority Alcorta cited as the gateway to Title IX claims does not discuss hostile work environment. In fact, the Supreme Court opinion discusses private rights of action for discrimination and retaliation claims only, and the work "hostile" does not appear in the text of the opinion. *Jackson v. City of Birmingham Board of Education*, 125 S.Ct. 1497 (2005).

Alcorta claims she was the victim of a hostile work environment while at Basalt. In order to establish a *prima facie* case of a hostile work environment, Alcorta must show she worked in an environment "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). The conduct must be "so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offend[ing] Title VII's broad rule of workplace equality." *Id.*, at 22. A determination of whether the environment is hostile requires consideration of all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. To avoid summary judgment, Alcorta must "demonstrate that the acts were sufficient to create a pervasively discriminatory hostile environment…" *Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005) at 1309. The conduct must be both objectively and subjectively abusive. *Harris*, 510 U.S. at 21-22.

    i.    *There is no evidence supporting Alcorta's claim of a hostile work environment.*

Alcorta cannot meet this burden because she cannot demonstrate a pervasively discriminatory environment that unreasonably interfered with her work performance. Alcorta contends she was subjected to a hostile work environment because 1) she was ordered not to stand during games she coached, 2) her players may have been treated more differently than male players with respect to technical fouls or warnings they received during games, 3) she was forced to read and prepare a report on a coaching book, and 4) she was treated differently than

male District coaches who were arrested on DUI charges. See *Plaintiff's Response to Defendant's First Set of Interrogatories*, attached hereto as Exhibit 1, at ¶2. Even if true, none of these accusations suggests severe and pervasively discriminatory treatment. Alcorta was not suspended or reassigned, her pay was not decreased, and she suffered no other action that could rise to the level of "unreasonable interference with her work performance." Taken together, Alcorta's examples of a "hostile" work environment: a suggestion that she follow CHSAA rules, a recommendation on how to deal with a student Alcorta acknowledged needed discipline, and being assigned a book to be read, are minor issues. The remaining issue, concerning the way the District handled Alcorta's DUI, is incongruous with a hostile work environment claim. As Alcorta presents separate assertions later of wrongful termination and failure to renew her contract, the DUI issue is discussed below..

Ms. Alcorta testified to the absence of a hostile work environment in her deposition. Specifically, in reference to her allegations that she was ordered to remain seated while coaching games, she confirmed that the direction given to her during a meeting in February of 2003 was simply to comply with CHSAA rules, which place substantial limitations on the rights of coaches to stand, shout and move around during games. (Alcorta Deposition Transcript, p.80.)

Alcorta's claims stemming from the District's treatment of her players is inapplicable to her own rights under Title VII and Title IX. Such treatment alleged by Alcorta was directed at her players, and not at her. Alcorta cannot assert violations of her rights through the treatment of others. Moreover, Alcorta acknowledged that one of her players was intimidating opposing players and her own teammates, both on the basketball court and in school, and suggested a joint approach with Waddick and Green to deal with the player. *Id.*, p.68, l.24. Despite such

suggestion, Alcorted objected to what she considered Green's inappropriate interaction with a player, labeling it discriminatory. *Id.*, p.69, ll.14-19.

Alcorta admitted that her assignment – to read a coaching book – imposed the same obligation as was expected of every Basalt coach – male or female. *Id.*, pp.135-36.

Alcorta cannot demonstrate the existence of severe or pervasive discrimination though such isolated, minor examples.

B. **The District is entitled to summary judgment on Plaintiff's claim that they violated Title VII and Title IX by subjecting her to dissimilar and discriminatory working conditions and terms.**

To establish a *prima facie* case of sex discrimination under Title VII, a plaintiff must show she 1) is a member of a protected class; 2) suffered an adverse employment action; 3) was qualified for the position at issue; and 4) was treated less favorably than others not in the protected class. *Sanchez v. DPS*, 164 F.3d 527 (10th Cir. 1998). The 10th Circuit takes a "case by case" approach in determining whether the circumstances warrant a finding of what constitutes adverse employment action. "[W]e will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Id.* at 532 (internal citations omitted). "Conduct is adverse employment action if it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883,886 (7th Cir. 1989)).

If a plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the defendant can make this showing, the

plaintiff must then show that the defendant's justification is pretextual.  If a plaintiff can present evidence that the defendant's proffered reasons for its employment decision were pretextual, i.e., unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial.  *Randel v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

The critical *prima facie* inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination" based on sex.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  There must be "at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption."  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-12 (1996).

Alcorta claims the District discriminated against her through the exact same employment actions set forth in her "hostile work environment" argument, namely: 1) she was ordered not to stand during games she coached, 2) her players may have been treated more differently than male players with respect to technical fouls or warnings they received during games, 3) she was forced to read and prepare a report on a coaching book, and 4) she was treated differently than male District coaches who were arrested on DUI charges.  See Exhibit 1, at ¶3.

With respect to Alcorta's allegations, there is no evidence that Alcorta was treated differently in the terms and conditions of her employment because of her sex.  As discussed previously, the actions cited by Alcorta do not approach the level of adversity described in *Sanchez* or *Spring*.  Alcorta suffered no "significant change" in her employment status, such as firing, failing to promote, reassigning, or a significant change in benefits through the actions she described.

The District has legitimate reasons for each action it took with respect to Ms. Alcorta. Waddick and Green recommended that Alcorta comply with CHSAA coaching regulations, and did so only after they received comments from game officials, parents and representatives of other schools that Alcorta was violating the rules. They undertook minor disciplinary action with a female basketball player, consistent with Alcorta's observation that discipline should be a "joint effort" between her and the administration. Waddick and Green assigned a book to Alcorta as they did to every other coach at Basalt, and discussed it with Alcorta only after her conduct suggested the need for guidance on proper coaching practices. The consequences of Alcorta's DUI were exactly what the District imposed on male employees, and were appropriate considering the nature of Alcorta's arrest, in which she was driving under the influence of alcohol with a fourteen-year-old passenger in the car. There is no evidence to suggest these reasons were pretextual.

**C.     The District is entitled to summary judgment on Plaintiff's claim that they violated Title VII and Title IX by refusing to promote her.**

In order to state a prima facie case of discrimination for failure to promote, a plaintiff must show that "1) that she was a member of a protected class; 2) that she was qualified for the position she applied for; 3) that she was rejected; and 4) that after she was rejected, the position was either filled by someone not in the protected class or remained available." *Carter v. Mineta*, 125 Fed.Appx. 231, 235 (10th Cir. 2005).

Alcorta claims two instances in which she was not promoted due to her gender: in 2001, when she sought the athletic director position at Basalt, and in 2003, when she sought a junior

varsity volleyball coach job.  *Plaintiff's Response to Defendant's First Set of Interrogatories* at ¶5.  Alcorta cannot maintain either claim.

>   i.   *Athletic director position*

At the outset, Alcorta's claim regarding the athletic director position is time-barred by the statute of limitations.  Her lawsuit includes a claim regarding action taken more than three years before the filing of her EEOC charge, and well beyond the 300-day limit.  In Colorado, a Title VII plaintiff must file a charge of discrimination with within 300 days after the alleged unlawful discriminatory practice occurs. 42 U.S.C. § 2000(e). The filing is a prerequisite to a civil suit under Title VII.  Alcorta filed her charge with the EEOC on January 15, 2004 (see charge attached hereto as Exhibit 2).  Actions taken more than 300 days before she filed her charge are time-barred.  Her reference to acts and events regarding the athletic director position in 2001 are from at least 900 days before she filed her charge, and must be excluded from this lawsuit.

Moreover, Alcorta cannot make a *prima facie* case of failure to promote.  She cannot satisfy the third element of the claim.  She testified that she did not apply for the athletic director position (Alcorta Deposition, p.159, ll.4-5).  Further, she was not qualified for the position because she did hold a required license.  (Waddick Affidavit, ¶5.)  Alcorta's case for refusal to promote must fail as related to the athletic director position.

>   ii.   *Volleyball junior varsity coach position*

Regarding the junior varsity volleyball coach position, Alcorta has not asserted, and cannot show, that such a position was a promotion from her current position.  In fact, common sense suggests that taking a junior varsity coaching position is a demotion from a head coach job. Alcorta cannot demonstrate she was qualified for the position, or that the position was

14

subsequently filled by a less-qualified male.  Alcorta's failure to promote assertions are groundless.

**D.     The District is entitled to summary judgment on Plaintiff's claim that they violated Title VII and Title IX by terminating her.**

Alcorta claims violations of Title VII and Title IX because the District 1) terminated her and 2) refused to renew her contract.  It should be noted that Alcorta acknowledged she was not under contract in the summer of 2003 when she received word her contract would not be renewed.  (Alcorta Deposition, p.193, l.15 – p.194, l.15.).  Consequently, she was not fired; the only District action was its decision not to renew Alcorta's contract.  For the purposes of this discussion failing to renew and termination will be addressed together.

To establish a prima facie case of gender discrimination in terminating or failing to renew a contract, a plaintiff must show that: 1) she belonged to the protected class; 2) she was adversely affected by the decision not to renew her contract; 3) she was qualified for the position; and 4) she was treated less favorably than her male counterparts.  *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1380 (10th Cir. 1994).

Alcorta's testimony at her deposition states clearly that she knew of only two male District coaches arrested for DUI: her husband, Nic Alcorta and Eric Nieslanik.  (Alcorta Deposition Transcript, *Id.*, p.182, l.25.)  She was unaware whether the circumstances of the male coaches' arrests were similar to hers, in which she had a fourteen-year-old girl with her and she had already been warned by the District that no more incidents of misconduct would be allowed.  *Id.*, pp.183-186.  Alcorta also was unaware of how the District handled the male DUI arrests.  *Id.*, p.184, l.9 - p.186, l.14.  Alcorta cannot demonstrate disparate treatment because it is clear

she did not know the facts and circumstances of the District's practices with regard to male coaches' DUI arrests.

Unlike Ms. Alcorta, neither Eric Nieslanik nor Nic Alcorta had histories of misconduct and neither been warned before their DUI arrests that future misconduct would result in their nonrenewal. (Affidavit of Superintendent Fred A. Wall, ¶¶5-6.) Following his arrest, Eric Nieslanik was placed on probation and warned that any future misconduct would result in the loss of his position. *Id.*, ¶6. Similarly, Nic Alcorta was placed on probation following his arrest, prohibited from driving District vehicles, and warned that future misconduct would result in the loss of his position. *Id.*, ¶7. Nic Alcorta was arrested again, and resigned before the next school year. Had he not resigned, the District would not have offered him another contract. *Id.*, ¶8. Ms. Alcorta, who had already been warned that future misconduct would not be tolerated prior to her DUI, was not offered a contract after her arrest, consistent with the same action the District took on its male coaches for similar offenses.

Alcorta was aware from her meeting in June 2003 with Waddick and Green that the District was planning to offer her a contract for the upcoming year as long as she had no further incidents of misconduct. (Alcorta Deposition Transcript, p.138, ll.19-21; Waddick Affidavit, ¶31.) After her DUI, the District determined that in light of her problematic history, Alcorta was not a suitable role model for students or as a representative of the District. (Waddick Affidavit, ¶37.) The District's decision not to renew Alcorta's contract was consistent with its gender-neutral practices.

**E.	The District is entitled to summary judgment on Plaintiff's claim that they violated Title VII and Title IX by retaliating against her.**

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: 1) she was engaged in protected opposition to employment discrimination; 2) she was subjected to adverse employment action; and 3) a causal connection exists between the protected activity and the adverse employment action.  *Sanchez v. DPS*, 164 F.3d 527, 533 (10th Cir. 1998). Title VII bars retaliation by an employer only if it is "because the employee has opposed any practice made an unlawful employment practice by [Title VII]." *Peterson v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002).  Clearly, "an employer's actions against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Id.* at 1188-89; *See also*, *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)("plaintiff must show that the individual who took the adverse action against him knew of the employee's protected activity").

Alcorta admits freely and often that she did not speak out against what she perceived as discrimination by the District against her or against the girls' basketball team.  (Alcorta Deposition Transcript, p.98, ll.20-21; p.100, ll.23-25; p.106, ll.15-19; p.185, l.23 – p.186, l.1; p.190, ll.3-13; p.198, ll.1-23.)  Alcorta takes the position she engaged in protected opposition when she challenged Green's "refusal" to schedule the girls to a "feature game."  At her deposition, she reversed her position.  *Id.*, p.98, ll.20-21; p.100, ll.23-25.

She cannot make a *prima facie* case because she cannot show that she engaged in protected opposition to discrimination.  Nor can she fulfill her burden of showing that the

District was aware of her protected opposition. Quite to the contrary, Waddick was never made aware of any such opposition. (Waddick Affidavit, ¶36.)

In her deposition, Alcorta took the position in her deposition that she was *not* fired for anything she said; she attributes the District's decision not to renew her contract on her DUI arrest and the problems discussed in the two previous meetings with Waddick and Green. (Alcorta Deposition Transcript, p.198, ll. 13-23. She also attributed her nonrenewal to jealousy by Green. *Id.*, p.84, l.22 – p.85, l.2. Alcorta's own statements demonstrate she did not engage in protected opposition; her testimony disproves her claim of retaliation.

Without having engaged in protected opposition, and without the District's awareness that she had done so, it is impossible for Alcorta to show the causal link between her opposition and adverse employment action. Alcorta's retaliation claims lacks tow of the three required legs, and thus fails.

**F.     The District is entitled to summary judgment because Plaintiff failed to exhaust her administrative remedies.**

Alcorta's EEOC charge is vague and fails to state the bases for many of her allegations in this action. Specifically, the EEOC charge asserts only that she was

> discriminated based on my gender, in that I have been terminated from my employment, while similarly situated younger and less qualified mail employees have been retained. Additionally, a less qualified male is currently performing the duties I formerly held at [the District]. Further, I have been subjected to a hostile work environment because of my gender.

Exhibit 2. Alcorta's claims in this action include failure to promote and retaliation, which were not part of Alcorta's EEOC charge. They must be disallowed.

## CONCLUSION

For the reasons cited above, the District requests that this Court grant it summary judgment with respect to both of Plaintiff's claims.

Respectfully submitted this 9th day of November, 2005.

                              SEMPLE, MILLER, MOONEY
                              & FARRINGTON, P.C.

                                  *s/Matt Ratterman*
By: _____
                              Patrick B. Mooney
                              Matt Ratterman
                              1120 Lincoln Street, Suite 1308
                              Denver, CO  80203
                              (303) 595-0941

                              ATTORNEYS FOR DEFENDANTS

## **CERTIFICATE OF MAILING**

I hereby certify that on the 9th day of November, 2005, a true and correct copy of the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was filed via CM/ECF and served upon the following:

Sander N. Karp
Leavenworth & Karp, P.C.
201 14th Street
P.O. Drawer 2030
Glenwood Springs, CO  81602

                                       *s/Matt Ratterman*
                                   _____

G:\Roaring Fork\alcorta\P\Motion SJ 051109.doc